**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**NYDEED B. K. NASHAD'DAI,**

      **Plaintiff,**

**vs.**                                                          **Case No. 4:03cv297-WS/WCS**

**GEORGE B. SAPP,
LIEUTENANT J. A. PICKLES,
SERGEANT R. W. LONG,
SERGEANT PADGET,
SERGEANT PHILMAN,
SERGEANT BRYAN,
OFFICER D.H. BEVIS,
UNKNOWN MAJOR OF SECURITY,
UNKNOWN OFFICER #2
UNKNOWN OFFICER #3,**

      **Defendants.**

_____/

**REPORT AND RECOMMENDATION**

Plaintiff, a *pro se* inmate, filed a fourth amended civil rights complaint under 42

U.S.C. § 1983, doc. 17, alleging numerous claims, including excessive and unnecessary

use of force, denial of medical attention, denial of due process, denial of First

Amendment right to seek redress, and harassment on the basis of his race and religion.

After service of the complaint, two special reports were filed in answer to the complaint.

Docs. 36 and 42.  Subsequently, the Defendants who filed the first special report (Long,

Philman, Padget, Bryan, and Bevis), doc. 36, moved to adopt the second special report,

doc. 42.  That motion was granted and only one special report, doc. 42, is pending and has been construed as a summary judgment motion.  Doc. 45.  Plaintiff was advised of his burden in opposing summary judgment, doc. 45, and he has filed opposition.  Docs. 53-55.

**Service Issues**

This issue was not raised in Defendants' summary judgment motion.  Service was directed only upon the seven named Defendants.  *See* doc. 22, p. 2, n.1.  At the time Plaintiff was directed to submit his summary judgment materials, doc. 45, he was also reminded that there were three unknown Defendants who were not yet a part of this litigation.  Plaintiff was given an opportunity to file a motion for limited discovery to determine the identities of the three unknown Defendants or, alternatively, Plaintiff was directed to review Defendants' exhibits and materials submitted with the special report, construed as a summary judgment motion, to ascertain the identities of the three missing Defendants.  *Id.*  Thereafter, Plaintiff requested an extension of time, doc. 46, which was granted in part, doc. 47, and a motion for discovery, doc. 48, which was denied.  Doc. 49.  Plaintiff was again given additional time to respond to summary judgment, *id.*, which he has done, docs. 53-55, but there is no indication that the three unnamed Defendants have been identified.  It is possible that the identity of these Defendants could still be obtained through subsequent discovery.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d

265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004)(citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

**The relevant Rule 56(e) evidence**

**Defendants' evidence**

On May 5, 2003, Correctional Officer Lago observed Plaintiff[1] standing at his bunk, writing.  Doc. 42, p. 5; ex. A, p. 3.[2]  Plaintiff was a houseman and was assigned to clean the bathroom.  Ex. A, p. 3.  At approximately 9:15 in the morning, he was "given several direct verbal orders to comply with his work, to which he refused . . . ."  *Id.*

---

[1] At the time of these events, Plaintiff was incarcerated at Taylor Correctional Institution.

[2] All exhibits referenced are those attached to Defendants' summary judgment motion, doc. 42.

Plaintiff is reported to have said, "I am not going to clean anything.  I am through working for today."  *Id.*  Plaintiff continued "to stand at his bunk writing."  *Id.*

Defendant Long escorted Plaintiff to the office of Defendant Pickles, the officer in charge.  Ex. B.  "Lt. Pickles tried to counsel with [Plaintiff] to no avail."  *Id.*; *see also* ex. C.  Plaintiff "continued with his refusal to work."  Ex. C.  Defendant Pickles determined that Plaintiff should be placed in administrative confinement for refusing to work and Defendant Long escorted Plaintiff to the medical department for a pre-confinement examination.  Exhibits B, C.  Officer Lago wrote Plaintiff a disciplinary report (DR) for "refusing to work."  Ex. A.

Plaintiff was in the medical unit at approximately 9:30 a.m.  Ex. D.  Plaintiff refused to answer the nurse's questions during the pre-confinement examination.  Ex. B.  Plaintiff also "became belligerent and disorderly."  *Id.*  Defendant Long tried to counsel with Plaintiff "about his attitude towards the medical staff to [no] avail."[3]  *Id.*  Defendant Long wrote Plaintiff a disciplinary report (DR) for "disrespect to officials."  *Id.*; *see also* ex. D.  Defendant Long then escorted Plaintiff from the medical department to the confinement unit.  Ex. B.  Plaintiff arrived in the confinement unit at approximately 9:45 a.m.  Ex. F.

"Once inside the confinement building [Plaintiff] refused to cooperate with staff during his in processing into confinement" and refused to answer questions.  Ex. B, p. 2.  Plaintiff was asked "if he had a profile" and if he "was on a special diet" but Plaintiff refused to answer any of the questions.  Ex. F.  Plaintiff was "briefed as to what [was]

---

[3] It is obvious that the statement was intended to say that the counseling was to no avail although it was written "to avail."  Ex. B, p. 2.

expected of him while housed in the confinement unit."  Exhibits E, F.  Plaintiff was not

cooperative with Defendant Philman or other staff members while processing him into

the confinement unit.  Ex. E.  Plaintiff was then placed in the shower by Defendant

Bevis for a strip search.  Ex. B.  Defendant Philman "was present during the strip

search." Ex. F, p. 2.  Defendants Philman and Bevis escorted Plaintiff from the shower

area to his cell.  Ex. E.  Plaintiff was not causing problems at that time and Defendants

Philman and Bevis "removed the restraints and returned to the officer's station."  Ex. F,

p. 2.

A short time later, at approximately 10:50 a.m. during the noon meal, Plaintiff

became disorderly.  Ex. G.  Defendant Bevis observed Plaintiff "forcefully shove his food

tray off of the food flap onto the floor, thus causing its contents to spill onto the floor."

*Id.*  Plaintiff "then stated, 'I don't want the sh– you crackers got.  I'm a warrior.' " *Id.*

Defendant Bevis was authorized to write Plaintiff a disciplinary report for "disorderly

conduct" and he would remain in administrative confinement pending disposition of the

charge.  *Id.*

At approximately 12:10 p.m., Plaintiff again "became disorderly on the wing."  Ex.

F.[4]  Defendant Bevis attempted to counsel with Plaintiff and "gave him an order to cease

his disruptive behavior, but he refused to comply with [the] orders." *Id.*  Defendant

Bevis then advised Defendant Philman that Plaintiff was being disruptive and refused to

comply with orders to stop his behavior.  Ex. E.  Defendant Philman tried to counsel with

---

[4] One document indicates the time as being 12:10 a.m., ex. F, but other documents
reveal it was 12:10 p.m., just after Noon.  Doc. 42, Exhibit, part 3 (Incident Report
Number 218-05-03-19C).  This time is also apparent from reviewing the affidavits as a
whole.

Plaintiff and ordered him "to cease his disruptive behavior, but he refused to comply with [his] orders."  *Id.*

Defendant Philman contacted Defendant Pickles and reported that Plaintiff was being "disorderly on the wing."  Ex. C.  Defendant Pickles entered the confinement unit at approximately 11:40 a.m., and ordered Plaintiff to stop his disruptive behavior, but Plaintiff "refused to comply with [his] orders."  Ex. E; *see also* ex. C; Doc. 42, Exhibit, part 3.

Defendant Pickles determined that chemical agents were necessary to bring Plaintiff into compliance and at 11:45 a.m., he "called the acting Warden, Bill Smith, and received authorization to use chemical agents."  Doc. 42, Exhibit, part 3*;* Ex. E. Defendant Pickles also confirmed with medical that there was no medical reason to prevent the use of chemical agents on Plaintiff.  *Id.*  Nurse Sadler informed Defendant Pickles that Plaintiff "was medically authorized for the use of chemical agents."  *Id.* After obtain authorizing, Defendant Pickles advised Plaintiff that "if he did not cease his disruptive behavior that chemical agents would be used, however, [Plaintiff] continued with his disruptive behavior."  Ex. E.

When Defendant Blanton entered the confinement area, he could hear Plaintiff "causing a disturbance on the wing."  Ex. K.  Plaintiff "was yelling and beating on the cell door."  *Id.*

After another five minutes of Plaintiff's continued disorderly conduct, Defendant Pickles "instructed Sgt. Blanton to administer (3) three one (1) second burst of chemical agent into [Plaintiff's] cell."  Ex. C, p. 2; Doc. 42, Exhibit, part 3; ex. K.  When Plaintiff "continued to be disorderly," Defendant Pickles "instructed Sgt. Blanton to administer

another (3) one (1) second burst of chemical agent into [Plaintiff's] cell."  Ex. C, p. 2; Ex.

K.  After this second application of chemical agents at approximately 12:21 p.m.,

Plaintiff ceased his disruptive behavior and was then taken to the shower.  Ex. C, p. 2;

Doc. 42, Exhibit, part 3..  Plaintiff was escorted to the shower by Defendants Bevis and

Padget at approximately 12:50 p.m.  Doc. 42, Exhibit, part 3; ex. L.

Plaintiff "was told to use cold water to wash off the chemical," he was "given

shorts only and escorted to medical for a post use of force examination."  Ex. C, p. 2.

Plaintiff was taken to medical at approximately 1:05 p.m. by Defendants Bevis and

Padget.  *Id.; see also* Doc. 42, Exhibit, part 3.  Plaintiff complained to medical staff that

he was "burning all over" but he denied any need for medical assistance.  Ex. M.

Defendants Bevis and Padget then escorted Plaintiff from the medical department back

to his decontaminated cell.  Exhibits F, L.

Plaintiff "was examined by Nurse Sadler[5] and was then placed in a

decontaminated cell."  Ex. C.  Plaintiff did not receive any linens, mattress, or pillow in

his cell "because he used his linens as a barricade on his cell door when the chemical

agent was being administered."  *Id.*; Doc. 42, Exhibit, part 3.  Plaintiff did not complain

about the lack of bedding and the water to Plaintiff's cell was never turned off.  Ex. E.

After being returned to his cell, Plaintiff was monitored by Defendant Bevis for one hour

to be sure he was not "experiencing any side effects from the chemical agent."  Exhibits

C, E.  No signs of respiratory distress were observed.  Doc. 42, Exhibit, part 3.  During

---

[5] At one point the spelling of this surname is Saddler, but at other points it is Sadler.
Exhibits C, P.

this period of monitoring, Defendant Pickles was in his office writing the paper work related to the use of force incident.  Ex. C.

Defendant Bryan submitted an affidavit in which he states that as part of his duties, he gathers all documentation relating to uses of force.  Ex. N.  Defendant Bryan was in the confinement unit on May 5, 2003, when Plaintiff was brought into the unit by Defendant Long.  *Id.*  That was the first contact Defendant Bryan had with Plaintiff and he has testified that he did not know Plaintiff at that time.  *Id.*  Defendant Bryan did not speak to Plaintiff and states that Plaintiff did not speak to him.  *Id.*  Defendant Bryan ultimately had contact with Plaintiff when he began gather documents and witness statements following the use of force on Plaintiff.  Ex. N.  Plaintiff refused to speak with Defendant Bryan and "refused to cooperate with the investigation."  *Id.*  Defendant Bryan departed the confinement unit and had no further contact with Plaintiff.  *Id.*

Defendant Sapp was the Warden of Taylor Correctional Institution at the time of the alleged events.  Ex. O.  Defendant Sapp also submitted an affidavit in which he states he does "not recall ever coming into contact with [Plaintiff] while assigned as the Warden . . ."  *Id.*  Defendant Sapp is certain that he "did not direct the staff to refuse appropriate grievance forms, bedding, clothing, or hygiene" items to Plaintiff.  *Id.* Defendant Sapp reviewed the Special Housing Confinement Dorm records for May 5, 2003, and those documents reveal Defendant Sapp was "not even present in confinement at any time on May 5, 2003."  *Id.*

At approximately 9:00 p.m., Plaintiff declared a psychological emergency.  Ex. H. Plaintiff was advised by a Nurse that he would be seen by medical staff the next day.

*Id.* At midnight, Plaintiff was yelling expletives out his cell door and saying, "I'll be out of here tomorrow when I see psych." *Id.*

The following day Plaintiff was seen by a psychologist, Stephen Sutton, and alleged that he was abused by staff. Ex. P. Due to this allegation, a second medical examination was conducted and an investigation was begun by the Inspector General's office on or about May 8, 2003. Exhibits P, Q. In this second medical examination, Nurse Young noted that Plaintiff had minor contusions on his back and ribs along with some bleeding in his right nasal passage. Ex. Q. "Excessive tenderness over right rib area" was also noted. Ex. P.

Following Plaintiff's allegations of abuse to Dr. Sutton, an Investigation was conducted by the Office of the Inspector General, Bureau of State Investigations. Ex. P Plaintiff told the investigator that he was physically abused by Defendants Bevis and Philman while being strip searched in the shower. *Id.* Plaintiff also reported that he was subjected to chemical agents for no reason and not allowed to shower for approximately two and a half hours. *Id.* Plaintiff claimed that after being given a shower, he was seen by a nurse and then taken to the Lieutenant's Office where Defendants Bryan, Philman, and Bevis beat him for nearly ten minutes. *Id.* Plaintiff said that Defendants Pickles, Padget, and Long witnessed the abuse but sat at a desk doing nothing to help him.

Defendants have submitted the Case Summary from the Bureau of State Investigations in which the investigator noted that the "time-lapse video survellience [sic] tape for the date and time specified shows Inmate Nashaddai was placed into the shower and strip searched without incident refuting his allegation." Ex. P. There was, however, no surveillance camera to record the alleged incident around the Nurse's

Station or Lieutenant's Office."  *Id.*  The investigation was "downgraded and closed"

based on "[w]itness statements and documentary evidence that" refuted Plaintiff's

allegations.  Ex. P.  Plaintiff then received a disciplinary report "for lying."  *Id.*

**Plaintiff's evidence**

Plaintiff has provided a declaration, sworn to under penalty of perjury, in

opposition to the summary judgment motion.  Doc. 54.  Plaintiff states that on May 5,

2003, he was "removed from general population at Taylor Correctional Institution D-

Dormitory and escorted to the supervisor's office."  Doc. 54, p. 4.  Defendants Pickles,

Long, and three other unknown officers were present.  *Id.*  Defendant Pickles

questioned Plaintiff regarding the allegation that Plaintiff refused to work.  Plaintiff

replied that he was reassigned, but the officer must have forgotten to change the work

assignment roster.  Defendant Pickles accused Plaintiff of lying and "made derogatory

and epithet statements" to Plaintiff.  *Id.*

Shortly thereafter, Plaintiff was escorted to the medical department for a pre-

confinement examination.  Doc. 54.  Plaintiff refused to answer anyone's questions,

asserting he was "in fear of racial discrimination again."  *Id.*  Defendant Long escorted

Plaintiff to the administrative confinement unit; Defendants Long, Philman, and Bevis

were present at that time.  *Id.*  Defendant Bevis talked to Plaintiff about the rules and

regulations of confinement and asked Plaintiff if he understood.  Plaintiff "chose not to

speak, but nooded [sic] [his] head for yes."  *Id.*  Defendants Long and Philman then

"made a few derogatory statements at" Plaintiff and Defendant Bevis "joined in."  *Id.*

Defendant Philman was "screaming" in Plaintiff's face and, "then without warning,

punched [Plaintiff] in the head."  *Id.*  Plaintiff was handcuffed with his hands behind his

back at the time and lost his balance.  Plaintiff fell into Defendant Bevis who then "slammed [Plaintiff] against a concrete wall."  *Id.*  "Defendants Long and Bevis did not intervene to prevent the punching and Defendants Long and Philman failed to stop me from being slammed into the wall."  *Id.*

At approximately 9:50 a.m., Defendants Philman and Bevis escorted Plaintiff to a confinement cell.  Doc. 54.  After being placed inside the cell, Defendant Philman "made derogatory statements at" Plaintiff and then "punched [him] in the face knocking the Muslim headwear (koofi) on the floor."  *Id.*  Defendant Philman spit chewing tobacco on the koofi and said, "We don't like Blacks or Muslims."  *Id.*  Defendant Bevis slapped Plaintiff in the face, "busted [his] lips" and said, "We will be back, boy."  *Id.*  Defendant Bevis closed the cell door and the Defendants left.  *Id.*

Approximately one hour later (10:50 a.m.), Defendant Bevis and an inmate worker came to Plaintiff's cell to serve the Noon meal.  Doc. 54, p. 8.  Defendant Bevis asked Plaintiff if he wanted the food tray, and when Plaintiff did not respond, he threw it on the floor.  *Id.*  Plaintiff testifies in his affidavit that he went to the cell window after te food tray hit the floor and was there when Defendant Pickles came to the door approximately twenty minutes later.  *Id.*  Plaintiff has submitted sworn testimony that he was not being disorderly or disruptive, nor did he refuse to comply with orders.  *Id.*

Defendant Pickles questioned Plaintiff about the food tray on the floor and Plaintiff told him that he had done nothing wrong.  *Id.*  Defendant Pickles left, but returned a short time later and opened the door's flap.  *Id.*, at 8-9.  Defendant Pickles asked Plaintiff what had happened earlier with the officers, but Plaintiff did not respond.  *Id.*, at 9.  Defendant Pickles then told Plaintiff that he could trust him and asked Plaintiff

again to tell him what happened.  *Id.*  Plaintiff replied that Defendants Philman and

Bevis had "assaulted [him] and made derogatory and racial epithets at [him]."  *Id.*

"Then, without warning, Defendant Blanton stuck a fire extinguisher nasal [sic] in the

open door flap and sprayed [Plaintiff] with chemical agent."  *Id.*  Plaintiff turned his back

and tried to go to the window to breathe while Defendant Blanton continued to spray the

chemical agents.  *Id.*  A short time later, Defendants Pickles and Blanton stopped the

use of force, slammed the cell door closed, and left.  *Id., at 9-10.*

Plaintiff attempted to remove his clothes which were "infested" with chemical

agents, but "without warning, Defendants Pickles and Blanton returned and open [sic]

door's flap and Defendant Blanton sprayed chemical agent into the cell."  *Id.*, at 10.

Plaintiff states that he was not yelling, kicking on the door, or being disruptive in any

way to cause the use of chemical agents on him.  *Id.*

Later, Plaintiff was given a shower and a pair of boxer shorts only, and escorted

to the medical department for an examination.  Doc. 54, p. 10.  Shortly after that,

Defendant Bevis escorted Plaintiff into another office where Defendants Pickles,

Philman, Padget, and Bryan were waiting.  *Id.*  Defendant Pickles made racial epithets

and derogatory comments and then, "without warning, Defendant Philman punched

[Plaintiff] in the nose."  *Id.*, at 10-11.  Defendant Bryan then hit Plaintiff in his face and

head, and Defendant Bevis punched Plaintiff in his back and ribs.  *Id.*, at 11.  Plaintiff fell

into a desk and wall while Defendants Philman, Padget, Bryan, and Bevis continued the

assault.  *Id.*  Plaintiff has testified that Defendant Pickles was punching him in his head

and face when he lost consciousness.  *Id.*  When Plaintiff "awoke blood was everywhere

and Defendants Philman and Bevis were holding [Plaintiff] up."  *Id.*  Plaintiff contends

that this assault resulted in his nose being broken, and he suffered lacerations in his mouth and on his scalp, and numerous bruises and contusions on his back, ribs, arms, shoulders, face, and head.  Doc. 54, p. 12.  Plaintiff was "thrown back into the same cell and it was empty."  *Id.*  Plaintiff contends his cell had not been decontaminated and was still had chemical agents on the ceiling, walls, and floor.  *Id.*  His cell was totally bare except for a steel racks, steel toilet, and the sink.  *Id.*

After the 4:30 p.m. shift change, an unknown officer came to Plaintiff's cell door with an inmate worker.  *Id.*, at 12.  Plaintiff was asked if he wanted a food tray, he replied yes, and was told, "It's on it's way."  *Id.*, at 13.  Plaintiff was then served a meal known as a "nutrient loaf."  *Id.*  Plaintiff refused to take it and asked for an inmate request form, a grievance form, and a pen.  The unknown officer told Plaintiff that Defendants Pickles, Sapp, and an unknown Major of Security said Plaintiff would "get nothing."  *Id.*  Plaintiff asked about a mattress, shower, and having his cell water turned on.  *Id.*  The unknown officer replied, "You get nothing at all and if you don't get off the cell door, then I will gas your ass."  *Id.*  Plaintiff went to the steel rack and sat down.  *Id.*

At approximately 6:25 p.m., Plaintiff was unable to pray his "Islamic mandatory (Asr Salaat) prayer" due to the severe pain from the assault and lack of water to perform WuDu in accordance with his faith.  Doc. 54.  Plaintiff asserts that he could not perform the mandatory prayers for six weeks due to the injuries he received from the assault by Defendants.  *Id.*

**Analysis**

**Eighth Amendment**

The majority of Plaintiff's claims are based on the Eighth Amendment. A claim that excessive and unnecessary force was used by correctional officers is founded upon the Eighth Amendment and requires a showing of "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Relevant to the inquiry will be "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Id.* at 320; *see e.g.*, Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991); Ruble v. King, 911 F.Supp. 1544, 1554 (N.D. Ga. 1995). In evaluating such a claim, courts "must balance the 'prisoner's Eighth Amendment rights with the competing institutional concerns for the safety of prison staff and inmates.'" Ruble, 911 F.Supp. at 1554, *quoting* Williams, 943 F.2d at 1575.

Furthermore, while the absence of serious injury is relevant to an excessive force claim, that does not end the inquiry. Baldwin v. Stalder, 137 F.3d 836, 839 (5th Cir. 1998), *citing* Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992). In Hudson v. McMillian, the Court stated that "the Eighth Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 1997), *quoting* Hudson, 503 U.S. at 10, 112 S. Ct. at 1000 (considering the "physical injury" requirement of the PLRA). "[T]he injury must be more than *de minimus*, but need not be significant." Siglar, 112 F.3d at 193.

As noted by the Supreme Court, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."  503 U.S. at 7, 112 S. Ct. at 999; *see also* Harris v. Chapman, 97 F.3d 499, 505 (11th Cir. 1996), *cert. denied* 520 U.S. 1257 (1997).  This is only one part of the inquiry.  If prison officials did not use force "in a good-faith effort to maintain or restore discipline," but did so "maliciously and sadistically to cause harm" *see* Hudson, 503 U.S. at 7, 112 S.Ct. at 999, an inmate presents a viable claim.

The use of force alleged by Plaintiff in this case, whether *de minimis* injury or not, is the type of force that might be considered by a reasonable jury to be 'repugnant to the conscience of mankind.' "  Plaintiff's evidence is that because he was not creating a disturbance, and Defendants were not acting in good faith but, rather, acted solely to cause him harm and punishment.

If Plaintiff's testimony were to be believed by a jury, a  jury could find that the use of chemical agents against Plaintiff was unnecessary, excessive, and designed to harm Plaintiff because he is Black or because he practices the Muslim faith.  Thus, Plaintiff has presented sufficient evidence to support his claims and demonstrate a genuine dispute of material fact as to whether there was a "need for the application of force," and whether the force applied was reasonable.

There is a secondary dispute about the level of physical injury needed to sustain Plaintiff's claims under 42 U.S.C. § 1997e(e).  Plaintiff has submitted evidence that he had a broken nose, and other minor injuries such as lacerations and bruising.  Although Defendants contend there was no injury at all to Plaintiff, Defendants also presented evidence showing that after Plaintiff declared a psychological emergency and was

examined by Nurse Young, minor contusions were observed on his back and ribs, with bleeding in his right nasal passage.  Thus, Plaintiff has shown a genuine dispute as to this issue as well.  Assuming Plaintiff's version of the facts to be true, it is sufficient to find Plaintiff suffered physical injury for purposes of § 1997e(e).  Defendants' summary judgment motion should be denied.

Plaintiff has also come forward with evidence to support his claims that Defendants violated the Eighth Amendment by failing to provide him with medical care, placing him back in a contaminated cell without running water, and taking away his bedding, pillow, clothes, and hygiene supplies, all without a purpose except to cause unnecessary harm and pain.  He further presented evidence that he was served the "nutrient loaf" for no reason except to punish him.  Defendants acknowledge the truth most of these restrictions, with the exception that Plaintiff's water was not turned off, but contend it was constitutionally permissible to take these actions under the circumstances.  Were Defendants' evidence to be credited by a jury, short deprivations to persuade a disruptive prisoner to calm down do not violate the constitution.  However, Plaintiff has come forward with enough evidence to create a genuine dispute of material fact sufficient to preclude summary judgment.

As for the use of the "management meal," Defendants contend it meets nutritional and caloric requirements, was for a short period of time, and is permissible.  In support of that assertion, Defendants cite to Cunningham v. Jones, 567 F.2d 653, 656 (6th Cir. 1977); Adams v. Kincheloe, 743 F. Supp. 1385, 1391 (E.D. Wash. 1990); and LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1994), for the proposition that there is no deprivation under the Eighth Amendment where a management meal is

nutritionally adequate.  Doc. 42, p. 24.  The difficulty with Defendants' argument at this

juncture is that while all of these conditions *might* be permissible as justifiable

punishment, Plaintiff has presented evidence that the intent was to cause unnecessary

discomfort to him because he is Black or is a Muslim.  Summary judgment must

therefore be denied as to the claims concerning the conditions of confinement and the

equal protection claims.

Defendants have argued that Plaintiff did not raise the equal protection issues in

the administrative grievance process.  That argument is incorrect.  In Plaintiff's

grievance dated June 22, 2003, he alleged that during the assault the officers "shouted

racial epithets for being stupid and dumb-ass Muslum [sic]."  Doc. 17, p. 26.  Plaintiff's

appeal to the Secretary, dated July 7, 2003, also provided allegations advising that he

was subjected to racial slurs.  Doc. 17, p. 30.  Additionally, Plaintiff presented

allegations that he was subjected to verbal harassment over his Muslim faith and

because he was black in separate grievances both of which were dated June 22, 2003.

*Id.*, at 35-36, and 45-46.  Finally, Plaintiff submitted a grievance appeal to the

Secretary's office dated June 29, 2003, which essentially alerted prison officials to the

entire range of problems Plaintiff alleged in this case.  Doc. 17, pp. 11-12.  The

response to Plaintiff's appeal was that the "subject of [his] grievance [was] currently

being reviewed by the investigative section of the Office of the Inspector General."  Doc.

17, p. 13.  An investigation into Plaintiff's many grievances, undertaken as one

investigation, must have necessarily provided the Department of notice that Plaintiff's

claims involved a racial discrimination aspect as well as a claim that he was subjected

to harassing treatment on the basis of his religious faith.  Plaintiff adequately exhausted

his equal protection claim and Defendants' motion for summary judgment is denied on this basis.[6]

### First Amendment

Defendants argue that Plaintiff's First Amendment claim[7] is insufficient because Plaintiff cannot demonstrate "actual injury."  Doc. 42, p. 25.  Defendants contend that Plaintiff "clearly obtained the necessary grievance forms to file a lawsuit related to his alleged abuse."  *Id.*  Plaintiff provided evidence on this claim that when he asked for grievance forms and a pen, an unknown officer told Plaintiff that Defendants Pickles, Sapp, and an unknown Major of Security said Plaintiff would "get nothing."  At some point later Plaintiff was obviously able to obtain grievance forms and submitted his complaint to prison officials.  Any deprivation of this First Amendment right was brief and did not hinder Plaintiff in seeking redress of grievance or in accessing the Court.  Thus, Plaintiff has not provided evidence of an actionable harm and summary judgment should be granted to Defendants' as to this claim.

### Retaliation

Defendants have argued that to the degree Plaintiff attempts to assert a retaliation claim, there is no evidence of exhaustion.  Doc. 42, pp. 25-26.  This claim is not viewed, however, as being a separate claim for retaliation under the First Amendment.  Rather, Plaintiff's claims of being "threatened" with further use of chemical

---

[6] It should be noted that the service orders specifically directed Defendants to file a motion to dismiss if they sought to argue that Plaintiff's claims were unexhausted and should be dismissed.  Defendants should not have sought summary judgment on claims they contend are unexhausted.

[7] The claim is a denial of access to the grievance process and the courts, not a claim of retaliation for the exercise of those First Amendment rights.

agents comes within the Eighth Amendment claims. Plaintiff's complaint does not separately allege a claim for retaliation within the "statement of claims" section of the complaint form, and none should be implied. Doc. 17, pp. 66, 68.

**Eleventh Amendment immunity**

Plaintiff's complaint, doc. 17, did not specify on what basis he sues Defendants. Nevertheless, it is well established that the Eleventh Amendment is an absolute bar to a § 1983 suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities. Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed.2d 90 (1974). Thus, a § 1983 suit against an official sued in his "official capacity" is barred by the Eleventh Amendment, unless one of three exceptions applies. None of tho first two exceptions are applicable in this case. *See* Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985); Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627, 119 S. Ct. 2199, 2205-06, 144 L. Ed. 2d 575 (1999); Gamble v. Florida Dept. of Health and Rehab. Servs., 779 F.2d 1509 (11th Cir. 1986) (waiver by the State or Congress). It is well established that Congress has not abrogated a state's immunity in enacting § 1983, Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979), neither has Florida waived its Eleventh Amendment sovereign immunity and consented to suit in federal court under § 1983. Gamble, 779 F.2d at 1520.

The third remaining exception to this constitutional bar is through Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). *See* Idaho v. Coeur d'Alene

Tribe of Idaho, 521 U.S. 261, 269, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997)

(reaffirming that prospective relief may be sought against a state official in federal

court); Sandoval v. Hagan, 197 F.3d 484, 492 (11th Cir. 1999), citing Summit Medical

Assoc. v. Pryor, 180 F.3d 1326, 1336-38 (11th Cir. 1999).  That exception does apply

because Plaintiff seeks injunctive relief, as well as monetary damages.

Here, the Defendants are entitled to protection from monetary damages against

them in their official capacities.  However, official capacity claims against Defendants

may still proceed for prospective injunctive relief.  Therefore, Plaintiff's fourth amended

complaint, doc. 17, proceeds against Defendants in their individual capacities only to

the degree Plaintiff could be entitled to monetary damages.

**Conclusion**

Because Plaintiff's First Amendment claim is not sufficient and because that is

the only allegation against Defendant Sapp, summary judgment should be granted in

favor of Defendant Sapp.  Plaintiff has demonstrated a genuine dispute of fact as to the

remaining claims against the remaining six Defendants:  Pickles, Long, Padget,

Philman, Bryan, and Bevis.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants'

motion for summary judgment, doc. 42, be **GRANTED** as to Plaintiff's First Amendment

claim concerning the denial of his request to seek redress of grievances, but otherwise

**DENIED**, that the claims for monetary damages proceed against Defendants Pickles,

Long, Padget, Philman, Bryan, and Bevis in their individual capacities and for

equitable relief in their official capacities, and that this case be **REMANDED** to the

undersigned for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on September 19, 2005.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**